Good afternoon, Illinois Appellate Court First District Court is now in session, the Sixth Division, the Honorable Justice Mary Mick for presiding, case number 21-0892, Margaret of Agwomoh v. Village of Dalton. Good afternoon, counsel. Welcome to our Zoom argument at the Illinois Appellate Court. Before we begin, a couple preliminary things just to remind you both that we allow 20 minutes per side. If you're in the middle of something we'll certainly let you finish. I would ask who's ever representing the plaintiff when you introduce yourself to let us know if you want to reserve any of that 20 minutes for rebuttal. Also, we're going to have you both introduce yourselves, tell us who you represent, and please pronounce the plaintiff's name so that we don't mispronounce it throughout the argument and do that before we start the clock running. So who's ever representing the plaintiff, please tell us your name and who you represent. Good afternoon, Your Honors. My name is Lynn Dowd, DOWD, and I represent the plaintiff, Margaret Agwomoh, who is the Special Administrator of the Estate of Solomon Agwomoh, and I would like to reserve about five minutes for reply. Okay, Ms. Dowd. Counsel? Good afternoon, Your Honors. My name is Jeff Krosick and I represent the defendants, Appellees, Village of Dalton, and Officer Perez. Okay. All right. Ms. Dowd, whenever you're ready, you may begin. Thank you, Your Honor. Good afternoon to the court. Again, my name is Lynn Dowd. May it please the court. I would like to focus on the two essential issues today. One being whether summary judgment was correctly entered under Section 4-102 of the Tort Immunity Act, and then whether it was correctly entered under Section 2-2 of the Tort Immunity Act. We submit that both grounds for summary judgment should be reversed on this record. And being mindful that the standard of review, of course, is de novo, coupled with the Pedrick standard, meaning that all the facts, all the evidence of record must be viewed in the light most favorable to my client. And any and all reasonable inferences that can be drawn from this evidence must be drawn in favor of my client. So with that, I'd like to very briefly summarize the facts that I think are important to frame this issue. And I know the court's read the brief, so I'll be very brief. On March 10, 2018, the decedent, Mr. Oglomo, was in an automobile collision where the airbags deployed. And as the record reflects, he suffered a head injury. Emergency paramedics were deployed. He was taken to Christ Hospital. And within minutes, the emergency room physician determined that he needed multiple CT scans, including one to his head. Officer Perez responded to the auto collision, accompanied the paramedics to the hospital, was present in the ER. And by his own testimony, he was aware that Mr. Oglomo suffered a head injury. He put him under arrest for suspicion of DUI, which under these facts was just a misdemeanor. So this started off with a misdemeanor arrest and ended in a death. En route to the CT scan room, Mr. Officer Perez accompanied the staff taking him there. And then once Mr. Oglomo was put in the CT scan room, Officer Perez was outside in what was described roughly as another room with a window where he could view what went on. The staff was dealing with Mr. Oglomo and starting to administer the CT scan. And at one point, Mr. Oglomo stands up. Again, this is the man with the head injury, disoriented, pulls off his collar, says he wants to go home. Ms. Avalos, one of the technicians, was dealing with him. Mr. O'Donnell, another technician, was present in the room and words were exchanged. And according to Mr. Officer Perez's own testimony and that of Mr. O'Donnell, Officer Perez went into the room to get Mr. Oglomo back on the cart. By Officer Perez's own testimony, he was not providing any police services. He was not enforcing any law. He was trying, by his own statement, to get Mr. Oglomo back on the cart. From this record, defendants- I'm going to stop you. If he's not enforcing the law, then doesn't that support the defendants' argument that he's doing protective services? Isn't he still have a guy under arrest that he's accompanying because he's under arrest? Isn't he still about, or arguably about, enforcing the law? No. Respectfully, Your Honor, the Barnett v. Zion case, and I'm reading the cases that was in their Supreme Court case. The officer must actually be engaged in the enforcement or execution of the law. Just accompanying a patient in a hospital has not been deemed enforcing a law. He was waiting to assume the arrest. And he's waiting for, at the conclusion of this medical procedure, this medical test being done, to then try to get a blood test. But he wasn't doing any there. He wasn't performing an arrest or enforcing any law. But I'm suggesting to you that this is leading you right into the defendant's position, that if he's not enforcing the law, if he's not there because he has a defendant under arrest, he's doing protective services. Or helping medical people do medical services, but he's not- I'm just suggesting you be careful about this, because if he's not there because he has a defendant under arrest, I think that leads you right into the defendant's argument that he's doing protective services. Thank you, Your Honor. And I will try to be very careful, because when I get to the whether or not he was engaged in the enforcement of the law, that leads into the Wolff-Lonwatton exception. But going back to whether he was providing police protective services, the circuit court made- the trial judge made a finding. She made a finding that he was affirmatively providing police protective services. So even if we accept that as true for purposes of this argument, that does not render 4-402 applicable. Because the statute, given its plain and ordinary- You mean 102? Do you mean 102? 4-102. Oh, 4-102. Forgive me. Yes, thank you very much. 4-102. Again, when the court's interpreting that statute, number one, just reading it on its face, giving it its plain and ordinary meaning, mindful that immunity statutes are strictly construed against the municipality, it plainly states that it only applies to the failure to provide police protective services or an inadequate provision of police protective services. We don't have that here. The circuit court made a finding that they affirmatively rendered police protective services. I understand that the court did not make a finding that there was a failure, but are you saying that as a matter of law, nobody could find that there was a failure? On this record, it cannot be found as a matter of law. That's correct. Because again, if we look at Officer Perez's own testimony on page C-356 of the record, he says, actually starting at C-352, he says his purpose in entering the room was to get Mr. Aguomo back on the cart, the CT cart. That was it. Well, he failed to do that. No, he didn't. He failed to get him back on the cart, counsel. He did not get back on the cart. But that's what it's about. But on C-362, and mindful that the timing of how long this all happened, no one has testified definitively. But on page C-362, Officer Perez testified, we put him back on the gurney. He got him back on the cart, ultimately. So if that was his goal, he succeeded. And whatever his goal was, there was no failure. He didn't fail to provide. If that was the service he meant to provide, he didn't fail. He achieved it. And, you know, what happened in between gets us into the willful and wanton misconduct leading into the next part of the statute. But section — Can I ask you a question? I'm not sure I understand your theory in terms of the two provisions of the Tort Immunity Act that are raised. You indicated earlier that Officer Perez went back into the CT room to get Mr. Aguamo to get back on the CT scan bed. And I guess my question to you is, throughout this entire period, he's under arrest, right? Because we know that it's undisputed that when he was transported to the CT room, he was handcuffed to the gurney. Once he was in the room, the handcuff was taken off, presumably, so that he could be placed on the CT scan bed, which would automatically go into the CT scanner. So throughout this entire course of time, he's under arrest, isn't he? According to Officer Perez, yes. Okay, so that's your theory. Well, is that your theory, I guess, is my first question. Well, the mere act of being under arrest had nothing to do with him entering the CT scan room and the entire litany and chain of events thereafter. The reason why I ask you this question is to determine what provision of the Tort Immunity Act, if any, apply. And if he's under arrest, then presumably he's enforcing the law in Section 2-202 would apply. But if he's not under arrest, then maybe there's an argument that he's either providing protective services, or maybe there's a third argument that he's simply helping out the medical professionals do their job, which is to get Mr. Perez back on the CT scan bed, which is something that I think the defense has suggested that that's all he was doing. And then you pointed out in your brief, well, if that's what he's doing, then none of these provisions apply. So what I'm trying to get my head around is, what is your theory of the case in terms of these two provisions of the Tort Immunity Act? Okay, thank you. Stated simply, we submit that neither provision applies for several reasons. Number one, notwithstanding that he was under arrest, when Officer Perez took it upon himself to enter the CT scan room, that act had nothing to do with the enforcement or execution of any law, which would trigger an analysis of 2-202. When he entered that CT scan room to order him back on the cart, it had nothing to do with the provision, the rendition of police protective services. In discussing 4-402, I submit to the court that the trial court made a finding. She made a factual finding that I think is erroneous, but minimally, pursuant to your question, shows there are issues of disputed fact that should be sorted out by a jury as to whether or not he was even engaged in the provision of police protective services or the enforcement or execution of any law. Let me stop you for one more moment. If you can see that Mr. Aguomo was under arrest, and then it's undisputed that Mr. Aguomo decided to, he didn't want to go into the CT scanner. He got up, he took off his cervical collar, and presumably, when Mr. Officer Perez went into a room, the CT scan room, he went into the room because his prisoner, his detainee, was about to leave, right? So, isn't he involved in the enforcement of law then? No. I respectfully, Your Honor. Minimally, that's a question of fact, whether his prisoner was about to leave. What was happening is that the medical staff was dealing with the patient. They've dealt with patients before who, you know, need to get on or off the carts. They have hospital security to do this. Officer Perez said he wanted the patient to comply with the act of being on the CT cart. And by the way, the defense has never raised or argued that they were assisting in the rendition of a medical service. That was never briefed, analyzed, ruled upon by the circuit court. That's something they're throwing in as a Hail Mary argument, I submit, in their appellee's brief. But there's nothing to support as a matter of law that he went in there because the prisoner was about to leave. His own testimony said it was to get him back on the cart. And quite frankly, there's nothing in the record that said the staff couldn't have done that themselves. He injected himself into a medical procedure and was not invited. If I understand your position correctly, it's that he was neither providing police protective services, nor was he enforcing the law. He was simply there to help the medical professionals get Mr. Aguomo back on the CT scanner so that they can do the CT scan. And so we don't even get to the question of whether there's willful and wanton conduct because neither provision applies in this case. Is that correct? Well, I think, yes, neither provision applies. But I won't concede he went in there to help the medical professionals do their job. He went in there and we don't know what he like. That's his testimony. He went in there and I think it's for a jury to decide, you know, was he just out of control and started ordering this patient around because the patient was not committing any crime. He was not threatening any of the personnel, even though Miss Avalos testified. I understand. She said at some point she was fearful. But the timeline of that is not clear. When he went in there, there were no threats. There was no law to be enforced. You know, the prisoner was not about to leave. That's never been argued. And under Pedrick, that inference should not be drawn. But my position is, even for the sake of discussion, if we take the circuit court's ruling where she said Officer Perez was rendering police provision services. Okay, let's just focus on that for a moment. She made a factual finding, which the defendants could not appeal. They're accepting that as true on this record. 4-102 doesn't apply, because in reading the statute, it only applies to the failure or the inadequate rendition of police provision services. And all of the cases that analyze this come to that conclusion. Counsel, you're technically out of time, but I want to give you a couple minutes, unless somebody else has any questions to address. You're welcome. You want me, because you really haven't addressed that at all. But you're technically out of time. So please take a couple minutes and tell us what your position is on that. Okay, I appreciate that very much, Your Honor. Thank you. With respect to 2-202, on this record, the immunity provision does not apply. And again, if we accept for the purpose of the argument that he was engaged in the enforcement or execution of a law, the Wilflin-Wanton exception on this record defeats that. Under the case law, I only need to prove one act of Wilflin-Wanton misconduct, and we've delineated nine. We've delineated nine acts, and I refer the court to the Prowell decision, Medina, and Glover. If I could just cut to the chase, would you do me a favor and just tick off those nine? Yes. And the evidence that you rely on, so that when Mr. Brosek responds, we can get his response. Okay, very good, Your Honor. And the basis for this testimony is from Dr. John Peters, the expert on taser safety and police training, Dr. Mulliken, the defendant's expert, the emergency room physician, and the various lay witnesses. So one, Officer Perez created the threat and the danger. He was not in a split-second decision-making mode, so his use of the taser was completely unwarranted. And that is, he was not a threat to anyone. Again, pursuant to the staff. The action is what? I'm sorry, counsel. The action is using the taser? Is that one of the nine actions? What are the actions that are Wilflin-Wanton? Okay. One, he created the danger. Two, he did not follow his own training in the use of the taser. Jolton claims he was perfectly trained, but even their policy said the taser should be used for compliance, not deadly force. If that was his training, the drive-stun mode should not have been used. That does not incapacitate the patient. It just aggravates a patient. So he should have only used the probe-stun mode. Dr. Peter said Perez intentionally and willfully applied the drive-stun technique. A jury could agree, even though we need not prove it was intentional. Number three, he failed to follow the taser product warnings. He never should have discharged the probes into Mr. Aguamo's chest area. He never should have pushed the taser into his body. Perez was aware he was not supposed to do this. He was warned it could cause cardiac arrhythmia, and he did it anyhow. Number four, he failed to use lesser means to de-escalate. And that's William Ross, the hospital safety officer, and Dr. Peters. He should have used less before he – the order of events by – Counsel, I'm going to keep you to a quick list. He failed to recognize a medical emergency when the patient urinated on the floor. Dr. Mulliken said that created a medical emergency, and he continued beating him. He never should have put his knee on Mr. Aguamo's back or spine, and he was trained to not to do that. He never should have put this man in a headlock, was trained to do that. There's evidence of a one-way beating on a head injury patient, which shows utter indifference for Mr. Aguamo's safety. And with respect to Dolton, that's all Officer Perez, which gives up to the vicarious liability. But Dolton itself, its training was deficient. It had an obligation to train its officers correctly, and its failure to do so was reckless and showed utter indifference for the safety of the public. Thank you, Your Honor. Anybody have any questions of Counsel before we hear from Ms. Cabeca? I think Justice Johnson may. Just very briefly, was this laid out at the trial court? Was the trial judge made aware of these eight items? Yes, this was all briefed. Anything else? All right, Mr. Peres. It pleases the court. The task before the court today is an easy one. There's only one question that this court needs to answer. At the time of this incident in the CT scan room in the hospital, was Officer Perez enforcing the law? If the answer is no, then Officer Perez is entitled to immunity under Section 4-102 of the Tort Immunity Act. Now, this court heard Plaintiff's Counsel admit today that Officer Perez was not enforcing the law. He just wanted Mr. Aguomo to get back on the CT scan cart. There was no law enforcement purpose for Officer Perez to want Mr. Aguomo to get back on the CT scan cart. The only reason for Officer Perez to want Mr. Aguomo to get back on the cart was so Mr. Aguomo could receive medical treatment. The facts of this case are analogous to the facts in this court's decision in Payne v. City of Chicago and the Seventh Circuit Court of Appeals decision in Turner v. City of Champaign. Well, Counsel, in both of those cases, there was nobody under arrest. And yes, the purpose of the officer being there was to protect that person, but there was no dual purpose like there is here, notwithstanding what Counsel has argued today. Here, there was at least a dual purpose in that Officer Perez was following his arrestee to the hospital, correct? That is correct. Not true in either of those cases. That is correct, Your Honor. The one distinguishing fact here is that there was an arrest, but Officer Perez testified that the arrest was effectuated at the scene of the accident. And as Counsel admitted, Mr. Aguomo was in custody already throughout the entire time that he was in the hospital. So at the point in time when Officer Perez entered the CT scan room, he was not affecting an arrest because Mr. Aguomo was already under arrest, nor was he trying to enforce a DUI. The CT scan was not part of a DUI investigation. He was guarding his detainee, wasn't he? That's correct. He went with Officer Perez went with Mr. Aguomo to the CT scan room because he needed to be with the arrestee. But when he was actually in the CT scan room, he was not affecting an arrest. He told Mr. Aguomo, get back on the cart. That's what Ms. Avalos testified to. And in fact, I'm just going to read a brief section of Ms. Avalos' deposition testimony here that was in the record. So she was asked, one moment here. Ms. Avalos was asked these questions and she gave these following answers. She was asked, and you also called Officer Perez in to help to assist you in providing Mr. Aguomo to get compliance with the CT scan, correct? Answer, yes. For Mr. Aguomo's own medical needs and his own personal health and his own personal safety, correct? Answer, yes. And that's on page 783 of the record. So the reason for entering the room. So assuming that the mission had changed, which is what the circuit court said, and it sounds like you're saying the mission changed from law enforcement to protective services. Where is the failure? And how is that failure tied to the alleged liability? The failure was in getting Mr. Aguomo subdued so that he could undergo medical treatment. And I'd like to say also that counsel's assertion that this is the first time that this has been argued by defendants is false. In the defendant's statement of facts in support of their motion for summary judgment before the trial court, they stated, quote, Perez was called into the room because the hospital staff feared for their safety. Additionally, Perez was called into the room to assist Mr. Aguomo to follow the directions of the hospital staff, end quote. And that's on page 11 of the supplemental record. And the court in its summary judgment order noted that, saying, quote, Officer Perez observed these events and entered the room to aid the staff to try to diffuse the situation and to get the patient to comply with the staff instructions. So this is something that was briefed in the trial court and also the trial court mentioned just before it rendered its decision in this case. So where is the failure and where is the connection between that failure and the liability? The failure was to get Mr. Aguomo on the cart. As Plano's counsel said, they wanted to get Mr. Aguomo on the cart so that he could undergo a CT scan. Mr. I'm sorry, Officer Perez entered the CT scan room and said, get on the cart, which is the exact same instruction that Miss Avalos was giving to Mr. Aguomo. Mr. Grossage, that failure that you're referring to, which is get back on the cart, does that have anything to do with police protective services or is that more of medical services? Well, Mr. Officer Perez was not providing a medical service here. He was trying to get, he was trying to subdue Mr. Aguomo so that the medical staff could be the ones to render the medical service. And it's the exact same thing that happened in Payne, in Payne where the paramedics were present and they were waiting for the police to arrive so they could take the plaintiff in Payne to the hospital. It's the exact same thing in this case. Let me ask you this. Is it the police officer's duty to see to it that Mr. Aguomo gets a CT scan? I mean, I don't know that that's the duty of a police officer. It's not that you're correct. It is not the duty of a police officer to make sure that Mr. Aguomo gets a CT scan. But the police officer in this case was providing the service of assisting the hospital staff and getting Mr. Aguomo to be treated. And that's the exact same thing that happened in Payne and also in Turner when they were taking the plaintiff in for a mental health evaluation. In all three cases, those two cases and this one, the police were helping to get the person in question medical treatment. But the CT scan here was a prerequisite. It needed to be done so that Perez could then effectuate his arrest. Well, actually, in answer to that question, I want to just cite to another section of Miss Avalos' deposition. She was asked whether or not. So here she was. She said, quote, We never did any kind of DUI kit at that point. And Dr. Thomas said that she was more concerned about him, Mr. Aguomo, going to CAT scan and told the officer that if we can get the CAT scan done before we did any kind of formal DUI or anything like that. And Officer Perez said he was totally OK with it. So the CT scan was not a part of the DUI investigation. It was something that needed to be done for Mr. Aguomo's own medical needs and needed to be done before the DUI investigation. Correct. But it was not part of it. And Officer Perez agreed he didn't he wasn't for it. He agreed that it should be OK because that's what the medical staff determined needed to happen. But it wasn't Officer Perez independently for a law enforcement reason who wanted Mr. Aguomo to undergo a CT scan. There was no law enforcement reason for the CT scan was purely for Mr. Aguomo's medical treatment. So just so I understand your position is that he failed to get him on the CT scan and that the gurney for the CT scan, that's a failure. My position is that he was providing. I think the focus on a failure is somewhat. I mean, I know the statute says failure, but in both. It says failure, very specific. It does say failure. So, I mean, we could ask yourself, what was the failure and pain? I mean, they tasered him and he fell out of a window and he was still brought to the hospital. He was subject to suicide, committing suicide. And that's where they were caught. Yes. Yes. And in pain, well, the court stated was that the police were not because I'm reading from pain now. It says the police were not there to enforce or execute any law nor provide any medical attention, but rather to provide police assistance to subdue plaintiff for plaintiff's own safety and the safety of his family members. And here in this case, what Officer Perez was doing is he was trying to subdue the plaintiff for his own safety and for the safety of the hospital staff and to get the plan to undergo medical treatment. Those are police services. They're not law enforcement services. They're not law enforcement. And that is why Section 2-104 applies in this case and Officer Perez is entitled to absolute immunity. Would you address Mr. Grosich? Let's assume for sake of argument that he was enforcing the law. After all, the only reason he's there throughout the course of this entire incident is because Mr. Aguomo is under arrest and he's there presumably because he's guarding his detainee. Let's assume that he's there enforcing the law. Would you explain to us why the evidence that Ms. Dowd has pointed to, those nine pieces of evidence, why that does not create a genuine issue material effect such that the applicability of Section 2-202 of the Tort Immunity Act has to be resolved by the jury? Yes, of course, Your Honor. So a few things I wanted to point out that I noted when counsel was speaking is that she said that Officer Perez did not try any lesser force before resulting in a taser, but testimony shows that Officer Perez did ask, did tell Mr. Aguomo to get back on the cart. So he used verbal commands before using the taser, and he actually warned Mr. Aguomo that he would use the taser. And counsel's argument in this regard, I think, is a little bit garbled because she says that in one time, Mr. Aguomo was disoriented and confused and didn't understand anything. But in the same time that, you know, they should have tried to talk him down. Well, in any event, Officer Perez did try to use verbal communication before he resulted to the taser. The next thing I'd say is the briefing and counsel today argued that Mr. Aguomo was shot in the chest. If you look at the photographs taken of Mr. Aguomo after he was deceased, the tasers are actually in his stomach. I'm trying to search for the citation here, but I believe it's on page 499 of the record. If you look at those photos of Mr. Aguomo, you can see clearly that the taser was not discharged in the chest, it was discharged into the stomach area, which is compliant with what is trained when officers are using a taser. And the testimony of all the witnesses here shows clearly that Mr. Aguomo was the aggressor. Avalos, Al-Khatib, and O'Donnell all called for security. Mr. Aguomo had Perez pinned against the wall and was grabbing for his taser. Mr. Aguomo's 6'2", 249 pounds. Mr. Al-Khatib described Mr. Aguomo as being like the Incredible Hulk. When the security guards arrived, Andre Walker testified that Perez was partially on his back and Mr. Aguomo was on top of him. It took multiple security guards plus Officer Perez to get control of Mr. Aguomo. And Mr. Aguomo was being so violent and combative that the doctor, Dr. Twano, ordered the hospital staff to give Mr. Aguomo a sedative because even after he was restrained, he was still violently thrashing around. So, in this case, Officer Perez, if he was enforcing the law, which he was not, but hypothetically if he was, he would be entitled to immunity under Section 202 because he acted reasonably and not with willful and wanton conduct because he was trying to protect himself while he was being attacked. Let me go back and follow up on some of Taylor's questions. Specifically, using the taser in drivestone mode is, I think the testimony was clear, doesn't immobilize anybody, only injures them and agitates them. Hurts them and agitates them. Why could a jury not find folks like that was willful and wanton? Well, the reason for using a drivestone mode is pain compliance. And so, if Officer Perez was getting attacked, which he was, he was using the pain compliance to try to- I'm sorry, let me stop you. That was pretty much before the attack, was it not? He walked in and said, get on the gurney, didn't get on the gurney, and then he tasered. That was the key point. My understanding of the sequence of events is that Officer Perez asked Mr. Aguomo, and what Ms. Avalos testified to is that Officer Aguomo asked, I'm sorry, Officer Perez asked Mr. Aguomo to get on the cart and then he said, get on the cart or I will tase you. And then Mr. Aguomo advanced on Officer Perez and that's when the taser was used. That was a testimony of Ms. Avalos. Okay. And the taser will not stop you from moving. It will only hurt you, correct? It causes pain, that's correct. But the evidence in this case also doesn't show that the taser itself definitively caused Mr. Aguomo to die. I mean, he was a obese man who the doctor said had an underlying heart condition. He was on some kind of substance. He had been injured in a car accident. He was given a sedative by the hospital staff. So it was multifactorial, as the coroner said. I mean, just because a taser causes pain doesn't mean it caused a heart attack. Wasn't he ruled a homicide by the U.S.? Wasn't he ruled a homicide? That's correct. But it was multifactorial. And as I said, Officer Perez was not the only one who was having contact with Mr. Aguomo and Officer Perez did not give him a sedative. Mr. Grosich, you indicated that Mr. Aguomo advanced on Officer Perez after Officer Perez said to get back on the CT bed or I'm going to tase you. Is there any contrary evidence or is that undisputed? I believe it's undisputed. I remember the testimony of Ms. Avalos in that regard. Officer Perez testified the same. I believe that testimony is undisputed. So let me ask you a larger sort of bigger picture question. The plaintiff's theory appears to be that Officer Perez unnecessarily escalated a situation from a verbal command to a taser and that there were things that could have been done in between to potentially diffuse the situation and weren't done. What's your response to that? Well, as I said before, Your Honor, Mr. I'm sorry, Officer Perez did try verbally to get Mr. Aguomo to comply. And he said the exact same thing that the hospital staff was saying, which is get back on the cart. So he was trying, again, to help the hospital staff in rendering medical treatment to Mr. Aguomo. So he tried verbal de-escalation. He gave Mr. Aguomo a warning. As counsel keeps saying, you know, Mr. Aguomo had a head injury. Maybe he couldn't understand what was being said. But either way, whether he had a head injury or not, he attacked Officer Perez and Officer Perez responded the way he did because he was trying to defend himself. And let me ask you this one final question. It's not raised in the briefs, but does a patient have a right to deny medical care? Could he have simply said, I'm not going into a CT scanner and you, Mr. Police Officer, can do nothing about it? I suppose I haven't researched that issue and I can certainly research it and answer it for you more thoroughly if you'd like. But I believe you're correct that a patient does have the right to deny medical treatment, assuming they're in the right state of mind. Any further questions? That's a good question. Any further questions? No. Okay. Can we watch Ms. Gow, Rebecca? Thank you, Your Honor. I'd like to make three points in my five minutes, if possible. The first being, I feel like I've taken the court a little bit into left field in deciding were protective police services provided, was he enforcing the law or not? That is not the essence of our argument. We have a ruling where the trial court said, yes, he was providing police protective services. Therefore, 4-102 applied. And the other half of her ruling was, yes, he was engaged in the enforcement and execution of laws. Therefore, 2-202 applies. Our position is that as a matter of law on this record, both rulings must fall. The first being simply his goal was to get him on the cart. He got him on the cart. Page C-362. He achieved his mission, unlike the other cases that they cite. What happened in between is a whole different issue and host of events leading into the willful and wanton behavior. But wasn't he deceased when he got on the cart? No, he was not deceased at that point. No. And, you know, again, a lot of these facts we're talking about minimally are disputed issues of fact. And this court ruled as a matter of law on this record that they get immunity. So, my first response is 4-402, blanket immunity cannot stand on this record. Second, 2-202, I'm accepting for purposes of the argument, he was engaged in the enforcement of a law. It falls for willful and wanton misconduct. Counsel brings up facts, they are disputed. There's plenty of evidence in the record disputing what Ms. Avalos said, Mr. O'Donnell, Mr. El-Khatib in the room said Mr. O'Glomo was calm. He was not threatening anyone and in barges, that's my word, barges, forgive me, in comes Officer Perez and then everything breaks loose thereafter. Is there a dispute as to whether Mr. O'Glomo was advancing on Officer Perez at the time Officer Perez tased him? Not according to Officer Perez's own testimony. His chronology of events is he said, get on the cart. If you don't get on the cart, I'm going to tase you. What's that all about? You tase someone for not getting on a cart? He wasn't threatening anyone. Officer Perez was not, he wasn't threatened at that point. He told him, you get on that cart or I'm going to tase you. The patient didn't comply with his command to get on a CT scan cart. He tases the man. He did not say that Mr. O'Glomo was advancing on that cart. Not at that point. No, it's only when they were like, even after all the tasing, that's when, according to multiple witnesses again, and a jury can sort this out at the exact rendition, there's competing testimony. That's when Mr. O'Glomo went towards Officer Perez and according to Mr. O'Donnell, it was to get the taser away from him defensively. There's evidence Officer Perez had wounds on his hand. Mr. O'Glomo had none. There's evidence to support a one-way beating. We only have to show that he was a proximate cause of the death, not the sole cause. And it doesn't, yes, there are other people involved, but in any event. So just to clarify, Ms. Dowd, when Mr. Grosich said it's undisputed that Mr. O'Glomo was advancing on Officer Perez, you're saying that there is a dispute because Officer Perez, in his own testimony, never said that Mr. O'Glomo was advancing on him before he tased him. Is that correct? Before he tased him, correct. Yeah, the first tasing he admitted was because he didn't comply with his command. And that was the threat he gave and that's re-executed and things escalated thereafter. And, you know, different people, there's Officer Perez and, you know, the decedent, they were actually in the fight. There were observers. Security came later. There's a lot of testimony, all of which a jury should sort out. The bottom line, though, again, we only need to show one act of willful and wanton to defeat 2-202. And notwithstanding the tasing, putting his knee on his spine, the headlock, failing to stop whatever he was doing once the man urinated, according to Dr. Mulliken, the defense expert, he expected Officer Perez to know this was a medical emergency, to know he shouldn't have done these things. Dr. Peters testified to all of this. The nine acts of willful and wanton, he testified within his police training. He knew not to do this, but he did it anyhow. In other cases, Prowell, I want to say Glover, forgive me, it's Prowell, Medina, and Glover. There was just one act, one act in each of those cases, two involved police officers, one involved EMTs, where they acted in violation of their training. The appellate courts reversed, said back those to a jury. That's enough to take us to a jury, one act. I submit to the court, and the court may disagree. I give you a list of nine. Pick one. We submit you should pick all nine. That gets us back. That throws out 2-202. Or actually, for purposes of summary judgment, they can try to prove it up at trial. They can try to prove up each of these defenses. But on summary judgment, our Supreme Court in Ziarko said willful and wanton is just degrees of culpability more than negligence. Therefore, it's virtually impossible for a court to enter summary judgment on a willful and wanton cause of action. For this reason, we submit there should be a reversal, and we'll take this back to the jury and let them sort out this very complicated and unfortunate set of facts. Can I briefly say something? Yeah, go ahead. In this case, fits very snugly into the analysis that this court made in Payne v. City of Chicago. The officer failed to help the staff in providing medical treatment to Mr. Guomo. He died. He did not receive medical treatment. It's the same as what there was in Payne and Turner, and therefore, this court should find that officer presence is entitled to immunity under Section 4-102. Dowd, you get the last word if you want to. We are the masters of the complaint. That is not what we pled, a failure to have provided medical treatment. We've alleged they were willful and wanton in their tasing and treatment of the decedent. Thank you. Thank you both. Thank you. This is a very interesting case. You've done a very good job presenting it to us, and we'll take it under as I see it.